IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

* * * * * * * * * * * * * * 22-CR-023-WES
*
UNITED STATES OF AMERICA *
*
VS. * FEBRUARY 28, 2024
*
JEAN RICHARD AUDATE *
* Courtroom 4
* * * * * * * * * * * * * * PROVIDENCE, RI

BEFORE THE HONORABLE WILLIAM E. SMITH

DISTRICT JUDGE

(Sentencing Hearing)

**APPEARANCES:**

FOR THE GOVERNMENT: JOHN P. McADAMS, AUSA
U.S Attorney's Office
One Financial Plaza, 17th Floor
Providence, RI 02903

FOR THE DEFENDANT: KENSLEY R. BARRETT, ESQ.
Marin & Barrett
1000 Chapel View Blvd.
Suite 260
Cranston, RI 02920

EON R. SMITH, ESQ
Smith & Company
140 Broadway, 46th Floor
New York, NY 10005

Court Reporter: Denise P. Veitch, RPR
One Exchange Terrace
Providence, RI 02903

28 FEBRUARY 2024 -- 2:00 P.M.

THE COURT: Good morning. We're here in the matter of the United States v. Jean Richard Audate. We're here for sentencing this afternoon. Let's have counsel identify themselves for the record, please.

MR. McADAMS: Good afternoon, your Honor. John McAdams on behalf of the United States.

MR. BARRETT: Good afternoon, your Honor. Attorney Ken Barrett and attorney Eon Smith, co-counsel for Mr. Jean Richard Audate.

MR. SMITH: Good afternoon.

THE COURT: Okay. Thank you very much.

Before we get started, there was a little bit of confusion I think about the aggravated identity theft count. I was under the impression that that was still part of the case; and the presentence report, which I'm about to go through, does describe that as part of the calculations, the mandatory minimum that's in that. The clerk has reminded me that there's a motion to dismiss that count that was never ruled on; so is that your intention?

MR. McADAMS: Yes, your Honor. There were legal developments in that statute that came to light after the Defendant had pled to it, and I had inherited this case from another prosecutor, and when I looked at it

after the legal developments came out, which in a nutshell the Supreme Court says it goes to the gravamen of the use of the identify. Here, the fact pattern seemed not to align with the spirit of that, of those legal developments; and after consultation internally and then consultation with defense counsel, we agreed that the best route to go was to dismiss that count, and so I think I had filed that motion back in October or so.

THE COURT: All right. All right. Well, that was an oversight I take it on our part and we didn't rule on that motion, so I'll grant that motion now, and that will affect the sentencing guideline calculations; I'll note that as I go through them.

There is also a modification to the guidelines that I will go through in detail about the two-point reduction because the Defendant has no criminal history points and a 4C1.1. So that modification will also be made to the presentence report and the new report. I'll put those on the record this afternoon, but then a new report will issue after today's hearing.

So before I set forth the guideline calculations, would counsel just confirm that you have had the opportunity to review the presentence report with your client and you've been able to answer all of

his questions.

MR. BARRETT: That's correct, your Honor. Although the PSR was initially completed in May of 2023, since then we had an opportunity to review the PSR with our client and at this point in time there are no objections.

THE COURT: All right. Very good.

All right. Then I'm going to put on the record now the advisory guideline calculations as they are detailed in the presentence report. We're dealing with Counts I through IV, conspiracy to commit mail fraud and mail fraud, and as noted in paragraph 7 -- I'm sorry -- paragraph 28, the Defendant's base offense level on these counts is a level 7. There's a 14-point upward adjustment because the loss amount in the case is one point -- in excess of 1.2 million and therefore falls between 550,000 but less than 1.5 million. There's a two-point upward adjustment because there were more than 10 victims in the case. All of that yields an adjusted offense level of 23. The Defendant then receives that two-point reduction that I mentioned earlier because he has no criminal history, and he also receives a three-point downward adjustment for acceptance of responsibility. And so as a result of those five points off of the 23, his total offense

level becomes an 18. As I noted, he has no criminal history. So at level, offense level 18 and Criminal History Category of I, the Defendant's advisory guideline range is 27 to 33 months of incarceration.

And I'll just confirm with the Defendant because I think, I don't think I asked you this, that there are no -- as I've now revised it, are there any objections to the presentence report?

MR. BARRETT: No, your Honor.

THE COURT: All right.

And no objections from the Government; right?

MR. McADAMS: No objection, your Honor. I'd just reserve the right to argue the applicability of that guideline change in the future if there are further developments in the law. Thank you.

THE COURT: Certainly. All right. So that said, we'll hear first from the Government with respect to the appropriate sentence.

MR. McADAMS: Thank you, your Honor. First I'd like to -- I know the Court is aware of this, but there were 10 victims who submitted written victim impact statements. One of those victims, whose initials are F.U., specifically requested that I read her victim impact statement into the record, so I'd like to do that. It reads: (Reading) Victim Impact Statement:

Why did I answer my phone on March 10, 2020? My family and I were slowly putting the pieces of our lives back together. My son-in-law was in prison, convicted for the attempted murder of my daughter. It is worthy to note prior to imposing his sentence the judge shocked those present by stating, "It's only a miracle that this is not a murder conviction." A lifelong health care professional, I knew this to be true. My daughter was as close to death as one can be without dying.

My granddaughter needed a new car. I wanted to upgrade to a newer used version. Her then boyfriend, an auto mechanic, agreed to go with me to look at the vehicle I wanted to purchase. And so it was, not knowing his phone number I picked up the phone. The male voice said, "Grandma, which grandson is this?" John, real name omitted, I replied. John called me Grandma. The grandparent scam began. He told me he was in jail, bail required. My only verbal response? Oh, no, I'm not letting this happen. The bail was $9500. Asked at the bank why I was making the withdrawal, I lied, as instructed by the leader. For 17 days I was called three times a day, the leader in the morning and another person at night. In hindsight, sworn to secrecy, they were concerned that I would see John.

The second installment, $55,000, took longer. The bank used delay tactics. When I received a personal phone call from a bank employee, I lied to him. Just before I was scheduled to pick up the funds, a bonus was added: The credit card scam, $4,000. On the appointed day and time I watched as the teller counted out $55,000, one bill at a time, stacked and handed to me. I did have a fleeting thought: What if this is a scam? My answer, God will take care of me.

The hardest part was telling my daughters. Another layer of pain to see on my daughters' face and hear in her sister's voice. My granddaughter feared I was destitute. Her brother's response: No way, Grandma is too intelligent.

My daughter told me I had hypervigilance, a PTSD symptom. The money was in rainy day account. I intended to pay cash for my new car. Debt-free for decades, I now have a car loan. My granddaughter is getting married next year. On a fixed income and with the current stock market losses and inflation, I'm unsure how much monetary assistance I can provide. With my daughter's assistance, I set up protected measures on all my financial and credit card accounts. At my bank's request, I met with bank officials to review their security policies. Mine was the largest

scam withdrawal in their 98-year history. They offer free financial seminars. On hold for now, I have been asked to participate.

I suffer flashbacks. The 10th of every month was a reminder. I will never forget the date: My mother's birthday. I apologized to whom I lied. I went to confession, telling my confessor I forgave all those involved in the scam.

Without anger or blame toward you, Jean Richard Audate, I say I forgive you. This federal court has found you guilty. May God's great love, compassion, and mercy for you on judgment day.

(Pause)

MR. McADAMS: It's signed by her.

THE COURT: Thank you.

MR. McADAMS: So, your Honor, I'll ask you to keep that statement in mind along with the other victims and the approximately 90 or so who did not submit impact statements.

The Government is recommending a sentence of 30 months imprisonment, which represents the middle of the guideline range as calculated by the Court. I recognize that's slightly different than my written sentencing memo, reflecting the change in the guidelines.

These grandparent schemes, as your Honor knows, are among the most pernicious forms of fraud that we see. They prey on a vulnerable population; they exploit their love for their grandchildren, their family members. They try to separate elderly people from other family members by directing them not to speak to, you know, the adult children of the grandchild, their spouse, people at the bank, and ultimately it's simply to steal money.

I cited a lot of statistics in my written sentencing memorandum. The Court has seen examples of this in other cases. These scams are everywhere. There's probably nobody sitting in this courtroom who doesn't know someone who's received this type of call. They're just ubiquitous. It's $10 billion a year in fraud; and ultimately these schemes cannot succeed without people like this Defendant. They're a critical cog in this fraud scheme. We know that these are international fraud schemes, that many of the people who are committing the misrepresentations over the phone, through the internet, are located overseas or in Canada, Mexico, other places beyond the reach of U.S. law enforcement, and ultimately they need people that are here in the U.S. to get the money, to receive the money in order to get it back; otherwise there's no

point in doing it, there's no money in it for them; and that's the role of this particular Defendant played.

And so really when the Court looks at it, you know, obviously if we get to a point we're able to get ahold of some of these defendants who are committing the fraud directly and bring them in front of the court, the Court will have an opportunity to hold those people accountable. But in the meantime, when all the Court has is defendants in front of them who play this role, the choke point that the Court can impose to try to stem this fraud is to hold these people accountable and to make people like this Defendant decide it's not worth it, the risk benefit is not worth it, given what's going to happen.

This Defendant, an educated person, he's graduated from a very well-respected liberal arts college, a four year degree. He's not a teenager, he's a young man in his 30s; and there's just really no explanation for why he would engage in this conduct other than to get a free chance at money. And so that calls out for punishment. None it works without him, and ultimately he's the one who has to pay the price for it. So the Government is recommending a sentence of imprisonment of 30 months. I think it's appropriate. This Defendant has since been indicted in

another case.

THE COURT: Can you tell me more about that.

MR. McADAMS: I don't know a lot of detail about it, your Honor. I did speak to the AUSA in Vermont about it. My understanding is that it's also essentially the same grandparent scheme and that the Defendant's role is also collecting the money. I don't know beyond that any great detail, but --.

THE COURT: That offense was allegedly committed while he was on pretrial supervision in this case; right?

MR. McADAMS: Yes, the dates of the indictment would postdate his arrest in this case. They might even postdate the guilty plea. I think it began in June of 2023. So I mean I think what that tells us -- I don't want the Court to interpret me as asking the Court to sentence him for that conduct, obviously, but I think it shows you what his prospects are in terms of recidivism. He's already essentially recidivated and also a lack of remorse and, you know, these schemes are designed so that the person who gets caught so to speak with their, you know, caught red-handed with their hand in the cookie jar can have plausible deniability: I didn't know it was grandparent scam; somebody told me that -- to go pick up money. It might have been

something else. I understood it was fraud, but maybe they thought it was Social Security fraud or PPP fraud or some big insurance company.

But this Defendant doesn't have that excuse anymore. He knows exactly what was going on by the time he had pled guilty in this case, and for him to engage in that type of behavior again is just incomprehensible.

Thank you, your Honor.

THE COURT: Thank you, Mr. McAdams.

MR. SMITH: Good afternoon again, your Honor.

THE COURT: Come up to the podium, please.

MR. SMITH: I'm sorry, Judge?

THE COURT: The podium.

MR. SMITH: I apologize.

Your Honor, Jean Richard Audate stands before you as an individual who has accepted responsibility. He came before this Court; he pled guilty. Your Honor, also note his efforts and his conduct as it relates to conversation that he had with the U.S. Attorney's Office.

Now, while the U.S. Attorney acknowledges that Mr. Audate was not the individual who came up with this scheme, that this is something that is designed by individuals overseas, he essentially is

(indecipherable) asking this Court to punish Mr. Audate because the arms of the government cannot reach the individuals that are overseas. Mr. Audate has taken responsibility for the conduct that he participated in. He accepted responsibility, he spoke openly about it, and he pled guilty to it.

Now, there is mention of a Vermont indictment. I can say to the Court that a search warrant was executed on Mr. Audate's home in New York. When that search warrant was executed, certain items were taken from his home. There was later on an arrest warrant that was issued because Vermont said that they had indicted him, and the matter was brought before the court in New York, the Southern District of New York. I represented Mr. Audate in that proceeding. The government was seeking to detain him, and the New York court did not find reason to do so.

Mr. Audate voluntarily came back to Rhode Island pursuant to an arrest warrant in Rhode Island because he allegedly violated a condition of his release. He came; he showed up on the 31st. From the 31st of January to now, Mr. Audate has been incarcerated. Why is it significant, Judge? Because throughout that entire time while Vermont is saying that they have an indictment, I have made every effort -- phone calls,

e-mails -- to try to get Mr. Audate arraigned in Vermont. They refused to do it; right? While I understand that AUSA McAdams is not saying that your Honor should punish him for a conduct which he has not been found guilty of is being -- he's asking your Honor to consider the fact that he violated a condition of his release and that he allegedly did that while he was on probation or parole. But, your Honor, my personal efforts to try to ascertain, to determine, to try to figure out exactly what happened, what is being alleged, has been stymied. They've refused, literally refused to arraign him and they're saying, Oh, we're going to wait until the Rhode Island matter is over. I said, Well, that has nothing to do with this case; we're talking about two separate things. Arraign him, because if you had an arrest warrant for his arrest in New York, if he was detained in New York he would have been brought back presumably to Vermont; you would have to arraign him at that point.

And so I say all of that to say, Judge, that we are in the position where we're operating blind. Allegations have been made. Yes, there is an indictment, we respect an indictment, but we also know that an indictment is far-fetched from the conviction. And so the allegations, it could very well be that

they're tying conduct that was allegedly committed by Mr. Audate to conduct that was committed prior to him being arrested here in Rhode Island or him pleading guilty in Rhode Island. We just don't know because we haven't been given that information. We have an indictment that is very, very, very, very vague, and I think everyone who has seen it agrees that it's vague.

And so, your Honor, I understand that this Court has to consider that Mr. Audate was out and he is alleged to have committed another crime, but I ask the Court to weigh the fact that there is not even an arraignment on that. We have no facts with regards to what is alleged to have happened in that case. And the fact that Mr. Audate has voluntarily shown up and obeyed every other instructions given by this Court, including after being arrested in New York, showing up to Rhode Island knowing that Vermont is saying that they have an open indictment against him; he's never ran. And that shows, your Honor, that he is somebody that can be trusted to obey the Court's instructions because he has done so; right?

In terms of the scheme, Judge, there is no one here that would say that this was okay, that what transpired, what Mr. Audate found himself to be a part of is something that he is proud or we are proud of,

but we want the Court to just take into consideration the role that he played. He was someone that was called upon to go and pick up packages, which he did; right? Whether or not he knew exactly what was going on, the Government readily admits that he may not have even known what kind of scheme it was, where the money was coming from. And yes, it was, it's a quick $500 to go and do this, and he made a bad decision, your Honor. But that was his role; right? Unfortunately that was his role. So I would just ask the Court in considering the sentence to take into account the conduct that has been admitted by Mr. Audate and what he himself did and the Government actually agreed that he did, which is -- again, I don't want to use diminishing terms, but he literally just went to pick up the money that he was instructed to pick up.

Thank you, your Honor.

THE COURT: All right. Thank you, Mr. Smith.

Mr. Audate, would you like to say anything before I impose the sentence?

THE DEFENDANT: Yes, your Honor. Firstly I would like to say that I'm sorry. I do have remorse for everyone that was affected in this conspiracy. I regret the choices that I made and the actions that I took that led me to being a part of people getting

hurt. My family, my friends never would have imagined something like this from me, and I absolutely regret that they -- the moment I decided to be a part of it all, and now I just look forward to knowing better and doing better.

Thank you, your Honor.

THE COURT: Thank you. You can remain standing. I'm not going to take too long with my comments. You know, I'll start by saying I appreciate your apology, I appreciate your comments about your remorse, and I believe you're sincere in the remorse that you have.

I hope you have some level of comprehension about how devastating this crime has been to the victims -- I get victim impact statements all the time in different kinds of crimes -- probably the most, some of the most heart-wrenching ones. Put aside crimes of, you know, incredible violence, murder, and that kind of thing. Or child exploitation. But if you get beyond that and you read the victim statements from these grandparent scams, they're some of the statements that are the hardest to read because of how devastating these scams are on the individuals that are involved. And I said in a recent sentencing of a woman who was involved in a similar kind of scam as this that other than cases involving child exploitation, exploitation

of the elderly is probably the next worst thing; and you can feel it when you read these victim statements, just how devastated these people are and they're devastated at a point in life when there really isn't a chance to recover. They don't have the time, they don't have the ability to make up for financial losses, they don't have the physical or cognitive ability to kind of fully recover from the trauma that's inflicted by this, and the guilt is just overwhelming and tremendous because they feel like they've let not just themselves down, but their families and their children and grandchildren, and it contributes to that feeling of loss of capability and independence that accompanies people as they get older. So I go through all that because I do believe you when you say you have regret for what you have gotten involved in here, but I really wonder if you fully appreciate just how deeply hurtful it has been to these people.

Now, I understand that you weren't the organizer of this scheme, that this wasn't, you know, you weren't at the top of the heap here and this is maybe an easy money opportunity for you, but you had to go there and actually look these people in the eye when you took their money, and I do wonder what crosses your mind when you're in that role. Did that happen?

MR. SMITH: No, Judge. This was him actually going to pick up mail, like money was mailed to a location and he would go and pick up the mail. He never physically visited any of these individuals. It was the money was mailed to an abandoned location or something.

THE COURT: Okay. All right.

MR. McADAMS: That's correct, your Honor.

THE COURT: Okay. All right. Then I take that back; you don't look them in the eye. It really doesn't change anything about what I'm about to say because I just feel like you have to know when you're receiving that money, you know, where it's coming from, what is happening here; and putting your head in the sand about it and saying, well, you know, I'm just making the fast buck and I'm not going to, I'm just going to -- I'm just going to put binders on and not look at what the impact is is not a way to escape responsibility.

So this is a case where I'm essentially in agreement with the Government about what should happen here. I wish it wasn't that way; I wish we could get the people who are the ones really responsible for creating these schemes charged and into this court. But as Mr. McAdams said, and I totally agree with this,

this scheme couldn't exist if there weren't people willing to participate as front line soldiers, if you will, as you did. And unless that conduct is punished in a way that reflects the seriousness of the offense then I don't think there would be any chance of disincentivizing or deterring people from taking that role. In other words, if they felt they could just get a slap on the wrist and walk away, they're going to feel more free to participate in that kind of a scheme.

So I think the Government's recommendation here after all is said and done I actually think is quite reasonable and it's very consistent with other cases that I have had involving this kind of conduct. It's exactly on point with two cases in particular, and I forget the name of those two -- the Alarcon case and the Valdez-Espinosa cases. Both of those defendants received a sentence of 30 months. So this recommendation of the Government, whether it intended it to be exactly on point to those prior cases or not I'm not sure, but is right in the ballpark of what other defendants have received for this type of conduct. So I'm in agreement with the Government's recommendation. I think it accurately reflects all of the sentencing factors, deterrence, protection of the public and consideration of you as a defendant, as well

as the nature and circumstances of the crime, and so I'm going to impose that as the sentence in this case.

All right. So in the matter of the United States v. Jean Richard Audate, the Defendant is sentenced to a period of incarceration of 30 months on Counts I through IV, to be followed by supervised release of three years. Special conditions of supervised release, in addition to standard conditions, are as follows: The Defendant is required to participate in a program of mental health treatment directed and approved by the Probation Office, as well as a manualized behavioral therapy program as directed by the Probation Office. The Defendant will participate in a program of substance abuse testing, up to 72 drug tests per year, and he may be required to contribute to the cost of his treatment and testing based on his ability to pay as determined by the Probation Office.

The Defendant will provide access to all financial information requested by the supervising probation officer, including, but not limited to, copies of all federal and state income tax returns, and all tax returns shall be filed in a timely manner. The Defendant will not open any new lines of credit, which includes the leasing of any vehicle or other property

or the use of existing credit resources without the prior approval of the supervising probation officer until all of his court-ordered financial obligations have been satisfied. The Defendant will maintain one personal checking account. All of the Defendant's income, monetary gains and other pecuniary proceeds will be deposited into this account, which will also be used for payment of all personal expenses. Records of all bank accounts including business accounts will be disclosed to the probation officer upon request. The Defendant may not transfer, sell, give away or otherwise convey any asset with a fair market value in excess of $1,000 without the approval of the supervising probation officer until all financial obligations imposed by the Court have been satisfied. And finally, the Defendant will not hold any employment having fiduciary responsibilities during his term of supervision without first notifying his employer of his conviction. The Defendant will not hold self-employment having fiduciary responsibilities without the approval of his supervising probation officer.

Restitution in this matter is ordered in the amount, the total amount of $867,149 in the amounts and to the individuals that are detailed in the presentence

report. There will be no fine. There's a special assessment of $400 the Defendant is required to pay.

Did the Defendant waive his right to appeal in the plea agreement?

MR. SMITH: Yes, your Honor.

THE COURT: Okay. Since the sentence in this case was within the guideline range, your right to appeal has been waived by the, by that waiver. I previously granted the Government's motion to dismiss Count V.

So is there anything further from the Government?

MR. McADAMS: No, your Honor. Thank you.

THE COURT: Interest waived, yes?

MR. McADAMS: Yes.

THE COURT: Is there anything further from the Defendant?

MR. BARRETT: Your Honor, to the extent that the Court has any control about where Mr. Audate is going to be serving Bureau of Prisons, we would request for Danbury.

THE COURT: Danbury? Sure, I'm happy to make that request, or that recommendation, I should say, and we'll put that in the J&C; but understand the BOP makes those decisions, not the Court.

MR. SMITH: Yes, your Honor.

THE COURT: All right. With that, we'll be in recess.

(Adjourned)

C E R T I F I C A T I O N

I, Denise P. Veitch, RPR, do hereby certify that the foregoing pages are a true and accurate transcription of my stenographic notes in the above-entitled case.

/s/ Denise P. Veitch_
Denise P. Veitch, RPR
Federal Official Court Reporter

March 26, 2024
Date